IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEYSHA MARIE C.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MARTIN O'MALLEY, | : | NO.  22-3939 |
| Commissioner of Social Security[2] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                          June  4, 2024

Plaintiff seeks review of the Commissioner's decision denying her application for disability insurance benefits ("DIB").  For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence.  Therefore, I remand the case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.      PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on August 11, 2020, alleging disability beginning on February 3, 2020,[3] as a result of osteoarthritis of the knees,

---

[1]To protect the privacy interests of plaintiffs in social security cases, I have adopted the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that judicial opinions should refer to plaintiffs in such cases by their first name and last initial.

[2]Martin O'Malley became the Commissioner of Social Security on December 20, 2023.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Commissioner O'Malley should be substituted for Kilolo Kijakazi as the defendant in this action.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[3]To be entitled to DIB, Plaintiff must establish that she became disabled on or before her date last insured ("DLI").  20 C.F.R. § 404.131(b).  The ALJ found and the

bilateral carpel tunnel syndrome, cervical herniated disc, cervical degenerative disc, depression, and low back pain with degeneration.[4]  Tr. at 78, 198, 216.  Her application was denied initially and on reconsideration.  Id. at 100-03, 110-12.  At her request, id. at 121-22, an administrative hearing was held before an ALJ on June 15, 2021.  Id. at 33-58.  On July 1, 2021, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled.  Id. at 13-28.  The Appeals Council denied Plaintiff's request for review on August 8, 2022, id. at 1-4, making the ALJ's July 1, 2021 decision the final decision of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on October 4, 2022.  Doc. 1.  The matter is now fully briefed and ripe for review.  Docs. 11-13.[5]

## II.   LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusions that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

---

Certified Earnings Record confirms that Plaintiff was insured through December 31, 2025.  Tr. at 15, 209.  I note that the Initial Disability Report erroneously indicates that Plaintiff's DLI is December 31, 2024.  Id. at 79.

[4]After Plaintiff's application, she was also diagnosed with a lumbar disc injury. Tr. at 797.

[5]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 7.

mind might accept as adequate to support a conclusion," and must be "more than a mere

scintilla." Zirnsak v. Colvin, 777 F.2d 607, 610 (3d Cir. 2014) (quoting Rutherford v.

Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal

issues.  Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.     Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.     If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3.     If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.     If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and
>
> 5.     If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§ 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the

burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007); see also Biestek v. Berryhill, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

## III.   DISCUSSION

### A.   ALJ's Findings and Plaintiff's Claims

In the July 1, 2021 decision under review, the ALJ found at step one that Plaintiff has not engaged in substantial gainful activity since the alleged disability onset date of February 3, 2020.  Tr. at 15.  At step two, the ALJ found that Plaintiff suffers from the severe impairments of traumatic rupture of the left intervertebral disc of the lumbar spine – status/post surgery, traumatic injury to the cervical spine, generalized anxiety disorder ("GAD"), bipolar disorder with depression, and bilateral osteoarthritis of the knees. [6]  Id. The ALJ found Plaintiff's carpal tunnel syndrome and obesity to be non-severe.  Id. at 16. At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings.  Id.

---

[6]Where appropriate, Plaintiff's impairments will be defined in the medical evidence summary.

The ALJ determined that Plaintiff retains the RFC to perform sedentary work except she can frequently lift and carry less than 10 pounds; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally stoop, crouch, kneel and crawl; occasionally reach overhead bilaterally; avoid concentrated exposure to extreme heat or cold, wetness or humidity, and vibrations; no exposure to driving vehicles, unprotected heights, and moving machinery; occasionally interact with supervisors, the general public, and co-workers; no work involving shared tasks with coworkers; work in a low stress job, defined as having only occasional decision making; only occasional changes in the work setting; can perform unskilled simple work of a routine, repetitive nature at a consistent pace, but not at a production rate pace where each task must be completed within a strict time deadline.  Tr. at 18-19.  Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff is unable to perform her past relevant work, but can perform other jobs that exist in significant numbers in the national economy.  Id. at 26-27.  As a result, the ALJ concluded that Plaintiff is not disabled.  Id. at 28.

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to properly consider and evaluate (1) the treating physician's opinion evidence, and (2) Plaintiff's credibility.  Doc. 11 at 2-16; Doc. 13. Defendant responds that the ALJ's evaluation of the opinion evidence and of Plaintiff's subjective complaints is supported by substantial evidence.  Doc. 12 at 4-12.

**B.**     <u>Plaintiff's Claimed Limitations and Testimony at the Hearing</u>[7]

Plaintiff was born on January 13, 1976, and thus was 44 years of age at the time of her alleged disability onset date (February 3, 2020) and 45 at the time of the ALJ's decision (July 1, 2021).  <u>Tr.</u> at 198.  She is five feet, four inches tall, and weighs approximately 177 pounds.  <u>Id.</u> at 216.  Plaintiff completed high school and has an associate's degree in business.  <u>Id.</u> at 51, 217.  She worked as a bus driver for Septa from 2006 or 2007 through 2020.  <u>Id.</u>

At the administrative hearing, Plaintiff testified that she cannot work due to numbness and pain on her right side.  <u>Tr.</u> at 41-42.  She described pain in her right foot and ankle that "feels like . . . electricity."  <u>Id.</u> at 42.  Plaintiff said the pain was a 9 or 10 on a 10-point scale and nothing helped when she experienced the pain.  <u>Id.</u> at 42-43.  The pain is exacerbated by sitting or standing for long periods.  <u>Id.</u> at 43.  She also complained of neck spasms throughout the day 3 or 4 times a week which cause pain and swelling in her shoulders.  <u>Id.</u> at 42-43.  Plaintiff also suffers from pain in both knees when she walks and sometimes her knees buckle, causing her to fall.  <u>Id.</u> at 44.  Although she can drive, Plaintiff testified that her husband does the driving because her "right foot gives out."  <u>Id.</u> at 48.

---

[7]Plaintiff's claims focus on her physical impairments rather than her mental health treatment.  Therefore, I will focus my review on Plaintiff's testimony and treatment regarding her physical impairments.

Plaintiff testified that Nirav Shah, M.D., prescribed a cane for her a few weeks prior to the administrative hearing for stability and balance.  <u>Tr.</u> at 44-45.[8]  Plaintiff testified that she can stand for 10-15 minutes with the cane and about 5 minutes without the cane.  <u>Id.</u> at 46.  She testified that she can sit for 10-15 minutes before having to change position, and can walk for a block with the cane and half a block without the cane.  <u>Id.</u>  Plaintiff estimated she can lift 5 pounds and if she lifts anything heavier, her back and knees would be in pain.  <u>Id.</u>  Plaintiff also testified to trouble focusing due to her pain, and that she does not socialize with others.  <u>Id.</u> at 47.  She also complained that her medications made her drowsy.  <u>Id.</u>

Plaintiff testified that she needs help with daily activities.  <u>Tr.</u> at 48.  For example, when grocery shopping, Plaintiff's husband accompanies her and she uses a scooter.  <u>Id.</u> at 48-49.  She is unable to lift the grocery bags.  <u>Id.</u> at 49.  She has difficulty with stairs so her husband and children do the laundry "the majority of the time."  <u>Id.</u>

At the hearing, a VE classified Plaintiff's job as a bus driver as medium, semi-skilled work.  <u>Tr.</u> at 52.  Based on the hypothetical posed by the ALJ, which is identical to the ALJ's RFC assessment, <u>see</u> <u>supra</u> at 5 (describing RFC), the VE testified that such an individual would not be able to perform Plaintiff's past relevant work, but could perform other work and provided three examples -- suture gauger, dowel inspector, and

---

[8]Although the transcript states that "Dr. Shaw" prescribed the cane, <u>tr.</u> at 44, it is clear after reviewing the record that Plaintiff was referring to her neurosurgeon Nirav Shah, M.D.

lens inserter.  Id. at 53.[9]  When asked by the ALJ if the use of a cane would affect the availability of these jobs, the VE said that it would not.  Id. at 54-55.  However, if the person would be late, leave early, or be absent four times a month, the VE said that there would be no jobs available.  Id. at 55.  The VE also testified that an unskilled employee could be off task for 20% of the time, including normal breaks, but anything over that would not be tolerated.  Id. at 55-56.

### B.   Medical Evidence Summary

Plaintiff has a history of knee pain.  On July 21, 2017, Plaintiff slipped in a wet bathroom and injured her left knee.  Tr. at 644.  On July 27, 2017, Plaintiff saw William C. Hamilton, M.D., and based on his examination and x-rays, he diagnosed degenerative joint disease of the left knee aggravated by the fall.  Id.  A corticosteroid injection did not help the pain and Dr. Hamilton prescribed Relafen.[10]  Id. at 643.

Plaintiff was involved in an accident on May 21, 2018, when a van struck the Septa bus she was driving.  Tr. at 610.  She was seen at Temple University Hospital's emergency department complaining of neck, back, and left shoulder pain.  Id.  A CT scan of Plaintiff's cervical spine revealed no fracture or subluxation.  Id. at 616.  On May 22,

---

[9]Sedentary work "involves lifting no more than 10 pounds at a time."  20 C.F.R. § 404.1567(a).  When the ALJ asked about the specific lifting and carrying requirements for each position the VE identified, the VE testified that the suture gauger lifts no more than 2 pounds, the lens inserter no more than 3 pounds, and the toy stuffer (rather than dowel inspector) lifts no more than 2 pounds.  Id.  This discrepancy is not material to my decision.

[10]Relafen is a non-steroidal anti-inflammatory drug ("NSAID") used to relieve the symptoms of rheumatoid and osteoarthritis.  See https://www.drugs.com/relafen.html (last visited May 15, 2024).

2018, Susan Kuruvilla, M.D., noted that Plaintiff had full range of motion in the neck and back and a straight leg raising test was negative.[11]  Id. at 999.  Plaintiff was treated with naproxen,[12] acetaminophen, and ibuprofen, and released.  Id. at 611, 614.  An MRI of the cervical spine performed on June 20, 2018, revealed disc desiccation with a 2 millimeter disc protrusion at C2-C3, disc desiccation with a 2 millimeter broad-based midline/left paramedian disc protrusion at C3-C4, and a 6.5 millimeter broad-based midline disc herniation displacing the cervical spinal cord at C4-C5.  Id. at 1038; see also id. at 1005.

On July 12, 2018, Plaintiff was seen by Bong-Soo Kim, M.D., a neurosurgeon, on referral from Dr. Kuruvilla.  Tr. at 597.  Plaintiff complained of left side neck pain radiating down the left shoulder, with intermittent paresthesia in the left arm and fingers, and weakness in her left arm and hand.  Id.  She also complained of low back pain with intermittent pain radiating down both legs (left greater than right) with spasms and weakness.  Id.  An MRI showed "a large herniated disc with cord compression at C4-5," and Dr. Kim recommended surgery.  Id. at 599.  On July 18, 2018, Dr. Kim prescribed oxycodone and increased Plaintiff's dosage of Flexeril.[13]  Id. at 596.  On July 30, 2018,

---

[11]The straight leg-raising test checks for impingement of the nerves in the lower back by determining whether there is pain when "the symptomatic leg is lifted with the knee fully extended; pain in the lower extremity between 30 and 90 degrees of elevation indicates lumbar radiculopathy, with the distribution of the path indicating the nerve root involved."  Dorland's Illustrated Medical Dictionary, 32nd ed. (2012), at 1900.

[12]Naproxen is an NSAID.  See https://www.drugs.com/naproxen.html (last visited May 15, 2024).

[13]Oxycodone is an opioid pain medication used to treat moderate to severe pain.  See https://www.drugs.com/oxycodone.html (last visited May 15, 2024).  Flexeril is a muscle relaxant used with rest and physical therapy to treat skeletal muscle conditions,

Dr. Kim performed an anterior cervical discectomy and fusion with instrumentation at C4-5.  Id. at 554.  On August 1, 2018, Plaintiff was discharged from the hospital with prescriptions for Bactrim, Valium, and oxycodone.[14]  Id. at 563.

At Plaintiff's first post-operative visit to Dr. Kim, on August 22, 2018, the doctor noted the incision was healing well, but Plaintiff continued to have neck and low back pain.  Tr. at 593.  Dr. Kim told Plaintiff to wean off oxycodone and continue with the muscle relaxant to ease shoulder discomfort.  Id.  At her second post-operative visit on November 21, 2018, Plaintiff continued to complain of neck pain, tingling in her left hand, and low back pain.  Id. at 590.  The doctor continued Plaintiff on oxycodone and Valium.  Id. at 592.

Plaintiff returned to work in February 2019 with ongoing neck, back, and shoulder pain, but in April 2019, had a resurgence of more severe pain in her neck although she continued to work.  See tr. at 655.  From November 2019 through February 2020, Plaintiff was placed out of work on bereavement leave, and then underwent a hysterectomy.  See id.  In May 2020, Plaintiff had a recurrence of the neck pain and weakness in her upper extremities.  See id.

---

such a pain, injury, or spasms.  See https://www.drugs.com/flexeril.html (last visited May 15, 2024).

[14]Bactrim is a combination of sulfamethoxazole and trimethoprim, both antibiotics.  See https://www.drugs.com/bactrim.html (last visited May 15, 2024). Valium is a benzodiazepine used to treat anxiety disorders or used with other medications to treat muscle spasms, stiffness, or seizures.  See https://www.drugs.com/valium.html (last visited May 15, 2024).

Plaintiff returned to Dr. Hamilton on May 13, 2020, complaining of bilateral knee pain and bilateral elbow to hand numbness and pain.  Tr. at 646.  The doctor referred Plaintiff to physical therapy for the left knee pain attributable to osteoarthritis, ordered an x-ray of the right knee and an EMG for Plaintiff's arm and hand symptoms, and prescribed splints for Plaintiff's wrists.  Id. at 647.  The doctor suggested viscosupplementation for her knees.[15]  Id. When Plaintiff returned on June 16, 2020, Dr. Hamilton noted that the EMG showed "[n]o significant carpal tunnel findings."  Id. at 653.  The doctor was waiting for the viscosupplementation agent to be available.  Id.

Plaintiff began treatment at Pinnacle Pain Management on August 4, 2020.  Tr. at 655-59.  Ronald Lincow, D.O., noted cervical and lumbar spasm and reduced range of cervical motion on examination.  Id. at 657.  The doctor noted that prior CT scans showed multilevel cervical and lumbar degenerative disc disease.  Id.  He prescribed tramadol, Celebrex and diclofenac gel, an infrared heating pad, an electrical and muscle stimulator unit, and was considering cervical interlaminar epidural steroid injections.[16]

---

[15]"During viscosupplementation treatment for arthritis, your healthcare provider injects hyaluronic acid into your joint.  This thick fluid may help reduce pain and selling in your arthritic joint (most commonly, your knee).  . . .  This works like a lubricant and shock absorber in your joint."  See https://www.hopkinsmedicine.org/health/conditions-and-diseases/arthritis/viscosupplementation-treatment-for-arthritis#:~:text=During%20viscosupplementation%20treatment%20for%20arthritis,of%20cartilage%20on%20their%20ends. (last visited May 15, 2024).

[16]Tramadol is a synthetic opioid and acts in the brain and spine to reduce the amount of pain you feel."  See https://www.drugs.com/tramadol.html (last visited May 15, 2024).  Celebrex is an NSAID.  See https://www.drugs.com/celebrex.html (last visited May 15, 2024).  Diclofenac gel is an NSAID used to treat mild to moderate pain, or signs and symptoms of osteoarthritis or rheumatoid arthritis.  See https://www.drugs.com/diclofenac.html (last visited May 15, 2024).

Id. at 658.  On August 21, 2020, during a telehealth visit, Plaintiff reported stopping

tramadol and Celebrex as ineffective.  Id. at 660.  Dr. Lincow prescribed tizanidine and

Lyrica.[17]  Id. at 661.  On September 1, 2020, Plaintiff reported no relief with the new

medications and the doctor increased the dosage of each and Plaintiff declined trigger

point injections.  Id. at 664.

     A cervical MRI performed on September 11, 2020, showed postsurgical changes

at C4-5, and suggested a "posterior broad-based left-sided disc protrusion which is

potentially artifactual but if real is causing asymmetric compression of the thecal sac,"

and a moderate-sized posterior and slightly more right-sided disc herniation causing cord

compression at C5-6.  Tr. at 758, 864, 1047.  On October 13, 2020, Dr. Lincow noted

muscle spasm in the lumbar and cervical spine and a positive straight leg raise test on the

right, with reduced range of motion in both the cervical and lumbar spine.  Id. at 808.  He

ordered a lumbar MRI.  Id. at 809.  The October 17, 2020 lumbar MRI showed a mild

disc bulge at L4-5 and a moderate diffuse disc bulge with moderate spinal canal,

moderate right and severe left foraminal stenosis at L5-S1.  Id. at 799, 863, 1049.  On

November 6, 2020, Dr. Lincow noted that Plaintiff was continuing to experience lumbar

pain rated at 9/10 radiating into her right thigh and calf, and neck pain radiating into her

upper extremities.  Id. at 805-06.  The doctor also noted Plaintiff's complaints of daily

---

[17]Tizanidine is a short-acting muscle relaxer.  See
https://www.drugs.com/tizanidine.html (last visited May 15, 2024).  Lyrica is used to
treat pain caused by fibromyalgia, or nerve pain in people with diabetic neuropathy, post-
herpetic neuralgia, or spinal cord injury.  See https://www.drugs.com/lyrica.html (last
visited May 15, 2024).

headaches since her injury and prescribed Topamax.[18]  Id.  He also ordered an EMG of

Plaintiff's lower extremity, continued tramadol and Celebrex, and referred Plaintiff to

neurosurgeon Nirav Shah, M.D.  Id. at 806.

      Plaintiff participated in physical therapy at the Spinal Rehab Network with various

chiropractors and physical therapists from July 28 to October 13, 2020.  N.T. at 671-749.

On July 28, 2020, Sean B. Mandel, D.C., noted decreased range of cervical motion in

flexion, extension, left and right lateral flexion, and left and right rotation.  Id. at 730.  On

August 6, 2020, physical therapist Maryanne Cardelli also noted decreased range of

cervical motion.  Id. at 694.  On October 13, 2020, chiropractor Mandel noted moderate

tenderness in Plaintiff's shoulders, moderate to severe tenderness in her thoracic spine,

severe tenderness in her cervical spine, moderate to severe spasm/hypertonicity in her

shoulder and back muscles, and severe spasm in her neck.  Id. at 695.

      The record also contains treatment notes from Elite Medical and Rehabilitation

where Plaintiff saw Loretta Brown, M.D., beginning on November 11, 2020.[19]  Tr. at

1065-67.  Dr. Brown prescribed naproxyn, gabapentin,[20] and Flexeril, id. at 1067, and

---

[18]Topamax is used to prevent migraine headaches.  It will only prevent migraine headaches or reduce the number of attacks.  It will not treat a headache that has already begun.  See https://www.drugs.com/topamax.html (last visited May 15, 2024).

[19]The earliest treatment records from Elite Medical are dated November 11, 2020.  Tr. at 1065-67.  However, those notes are entitled "Established Patient Encounter."  Id. at 1065.  Thus, it is unclear when Plaintiff began treatment with Elite Medical and Dr. Brown.

[20]Gabapentin is used to treat nerve pain from shingles.  See https://www.drugs.com/gabapentin.html (last visited May 15, 2024).

saw Plaintiff monthly through March 3, 2021, continuing the same medications.  Id. at 1051-64 (12/8/20, 1/6/21, 2/5/21, 3/3/21).

On November 27, 2020, Plaintiff began treatment with Dr. Shah of Princeton Brain & Spine.  Tr. at 795-98.  The doctor noted Plaintiff's complaints of pain in the neck, mid and low back which radiated to the bilateral arms and legs, right greater than left.  Id. at 795.  The doctor noted tenderness, decreased range of motion in the neck and spasm and tenderness in the trapezius muscles, lower back tenderness, a positive straight leg raising test, and decreased range of motion in the lumbar spine.  Id. at 796-97.  Dr. Shah diagnosed a traumatic rupture of a lumbar intervertebral disc, cervicalgia, injury to the lower back, and radiculopathy of the cervical and lumbar region.  Id. at 797.  He recommended L5-S1 decompression surgery, without fusion considering Plaintiff's age. Id.

Plaintiff returned to Dr. Lincow on December 18, 2020, who noted that an EMG performed on December 16, 2020, confirmed L5-S1 radiculopathy.  Tr. at 803.  The doctor noted that Dr. Shah recommended lumbar spine surgery, but Plaintiff declined at that time due to Covid-19.  Id.  The doctor also indicated that Plaintiff had begun treatment with Dr. Brown, who prescribed oxycodone, gabapentin, and Flexeril.  Id.  Dr. Lincow advised Plaintiff to stop taking his prescriptions (for tramadol and muscle relaxers).  Id.  When Plaintiff saw Dr. Lincow on February 26, 2021, she was preparing for a lumbar discectomy scheduled by Dr. Shah for March 5, 2021.  Id. at 802.

On March 5, 2021, James Barrese, M.D., performed right L5-S1 decompression surgery consisting of a lumbar laminectomy with microdiscectomy.  Tr. at 859-60, 1096.

At her first post-operative visit on March 15, 2021, Plaintiff complained of new thigh and buttock numbness, but stated that her preoperative symptoms had improved slightly.  Id. at 848.  Physicians' assistant ("PA") Susan J. Beckman noted that Plaintiff was able to toe and heel walk on the left, but not the right and she had decreased lumbar range of motion.  Id.  PA Beckman recommended she avoid bending and twisting, no lifting over 15 pounds, and "[s]he can return to driving after tapered off narcotics and has normal strength and good range of motion."  Id. at 849.  PA Beckman noted that Plaintiff would follow up with Dr. Shah in 6 weeks.  Id.

On May 17, 2021, Dr. Shah completed a Medical Source Statement indicating that Plaintiff suffered from lumbar and cervical radiculopathy.  Tr. at 915-16.[21]  The doctor opined that Plaintiff could sit for 0-2 hours in 10-minute intervals,[22] walk for 10 minutes, and stand for 15-20 minutes, could rarely lift less than 10 pounds, never push or pull with any extremity, and never reach, handle, finger, or feel.  Id.  The doctor noted that Plaintiff suffers from gait dysfunction and requires the use of a cane for walking, and opined that Plaintiff was not a candidate for sedentary work because she is unable to sit more than 10 minutes without pain.  Id. at 916.

---

[21]A duplicate of the report appears at pages 917-18.

[22]Dr. Shah checked the box indicating Plaintiff could sit for 0-2 hours, and then wrote "10 minutes" next to the question.  Tr. at 915.  He then stated that Plaintiff had to alternate between sitting and standing and indicated 10-minute intervals for sitting.  Id.  I interpret this to mean that Plaintiff could sit for 0-2 hours in an 8-hour day in 10 minute intervals.  For standing/walking, the doctor just wrote "standing 15-20 minutes" and "walking 10 minutes."  Id.

On December 7, 2020, at the initial consideration stage, prior to Plaintiff's lumbar surgery, Robert Czwalina, D.O., found, based on his review of the record, that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk 2 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday.  Tr. at 67-68.  The doctor also found that Plaintiff's ability to push or pull with the left upper extremity was limited and that Plaintiff could never climb ladders, ropes or scaffolds, and could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl.  Id. at 68-69.

On reconsideration on February 12, 2021, which was also prior to Plaintiff's surgery, Charles Joseph Hubbard, Jr., M.D., found the same sitting, standing, and walking limitations as had been found at the initial consideration stage, but noted that Plaintiff could only occasionally lift 10 pounds and frequently lift less than 10 pounds.  Tr. at 88.  The doctor also found that Plaintiff was limited in the use of her upper left extremity to push and pull.  Id.

### C.    **Plaintiff's Claims**

Plaintiff presents two primary claims challenging the ALJ's consideration of (1) Dr. Shah's opinion and (2) Plaintiff's subjective complaints.  Because I find that the ALJ misinterpreted the evidence of record in considering both, and because that error was not harmless, I will remand the case for further consideration.

First, Plaintiff claims that the ALJ failed to properly evaluate Dr. Shah's opinion. Doc. 11 at 7-12; Doc. 13.  Defendant concedes that the ALJ misconstrued evidence in evaluating Dr. Shah's opinion, Doc. 12 at 7, but argues that the misinterpretation is harmless.  Doc. 12 at 7-9.

The ALJ's consideration of medical opinion evidence is governed by regulations which focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.

20 C.F.R. § 404.1520c(a).[23]  The regulations list the factors to be utilized in considering medical opinions:  supportability, consistency, treatment relationship including the length and purpose of the treatment and frequency of examinations, specialization, and other factor including familiarity with other evidence in the record or an understanding of the disability program.  Id. § 404.1520c(c).  The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain these factors, but do not require discussion of the others.  Id. § 404.1520c(b)(2).  The regulations explain that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be."  Id. § 404.1520c(c)(1).  In addition, "[t]he more consistent a medical opinion(s) . . .  is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion(s) . . . will be."  Id. § 404.1520c(c)(2).

The change in the regulations did not change the basic rule that "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence she rejects."

---

[23]In contrast, the regulations governing applications filed prior to March 17, 2017, spoke in terms of the weight to be given each opinion, including controlling weight for the opinions of certain treating sources.  20 C.F.R. § 404.1527.

Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714

F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may

choose which evidence to credit and which evidence not to credit, so long as she does not

"reject evidence for no reason or the wrong reason."  Rutherford v. Barnhart, 399 F.3d

546, 554 (3d Cir. 2005); see also Plummer, 186 F.3d at 429 (quoting Mason v. Shalala,

994 F.2d 1058, 1066 (3d Cir. 1993)).

 Here, the ALJ found the opinion of Plaintiff's treating neurosurgeon partially

persuasive.

>  The undersigned considered the May 2021 opinion of
> [Plaintiff's] treating neurosurgeon, Dr. Nirav Shah, who
> opined [Plaintiff] could sit 10 minutes, stand 15-20 and walk
> 10 minutes, needing to alternate after 10 minutes for sitting
> and 15-20 otherwise.  She could rarely lift 10 pounds, never
> more, or push and pull with her upper or lower extremities.
> She could not reach in any direction and it was noted she
> dropped objects.  He stated [Plaintiff] had gait dysfunction
> and would be using a cane to assist with walking.  She was in
> physical therapy 2-3 times a week and not a candidate for
> sedentary work due to her inability to sit.  He stated she was
> unable to work ([tr. at 915-16, 917-18]).  This opinion is only
> partially persuasive; it is overly restrictive and not supported
> by [Plaintiff's] Princeton Brain and Spine treatment notes, or
> the record as a whole.  As for the use of a cane, this
> conclusion is not supported by any of the objective medical
> findings; the record documents a normal gait without the need
> for any assistive devices.  At her March 2021 post-surgical
> follow-up, [Plaintiff] was noted as having good range of
> motion and normal strength.  While she was told to avoid
> bending, twisting and lifting over 15 pounds, the only
> impediment to driving was taking narcotic medication ([id. at
> 847-74]).  Further, the statement that [Plaintiff] was unable to
> work is a conclusory statement on an issue reserved for the
> Commissioner.

Tr. at 25.

Plaintiff alleges and Defendant concedes that the ALJ mischaracterized the treatment notes from Plaintiff's post-surgical follow up in March 2021.  Doc. 11 at 7-8; Doc. 12 at 6-7.  In interpreting the treatment note from Plaintiff's first post-operative visit at Princeton Brain & Spine after her lumbar laminectomy, the ALJ found that Plaintiff had "good range of motion and normal strength."  Tr. at 25.  When that portion of the treatment note is read in context, however, it is clear that PA Beckman was referring to conditions necessary for Plaintiff to drive.  "She can return to driving after tapered off narcotics and has normal strength and good range of motion."  Id. at 849.  The PA was not commenting on Plaintiff's condition, but rather stating improvement that must occur before Plaintiff could drive again.  In fact, on examination (via telemedicine) at that time, PA Beckman noted decreased lumbar range of motion and an inability to toe and heel walk on the right.  Id. at 848.  She indicated that Plaintiff would follow up with Dr. Shah in six weeks.  Id.[24]

Defendant contends that the ALJ's misinterpretation of this treatment note "did not change the outcome of this case" because PA Beckman still found that Plaintiff was able to lift up to 15 pounds, which is consistent with the ALJ's finding that Plaintiff could perform sedentary work.  Doc. 12 at 7.  The problem with Defendant's argument is that it overlooks other limitations Dr. Shah found in his Medical Source Statement -- most importantly, limitations in Plaintiff's abilities to sit, stand, and walk.  Tr. at 915.

---

[24]Unfortunately, the only record from Dr. Shah post-dating PA Beckman's initial post-operative treatment note is Dr. Shah's Medical Source Statement.  Thus, it is unclear how Plaintiff presented to Dr. Shah 6 weeks later.

Sedentary work requires prolonged sitting with walking and standing required occasionally.  20 C.F.R. § 404.1567 ("Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary."); see also Social Security Ruling 83-12, "Titles II and XVI:  Capability to Do Other Work-The Medical Vocational Rules as a Framework for Evaluating Exertional Limitations within a Range of Work or Between Ranges of Work," 1983 WL 31253, at *4 (1983) ("prolonged sitting [is] contemplated in the definition of sedentary work").  Such a requirement is inconsistent with Dr. Shah's finding that Plaintiff could sit only 0-2 hours in a workday. See tr. at 915.[25]

    This error is compounded because the ALJ found the agency reviewing doctors' opinions on initial consideration and reconsideration "generally persuasive," and "persuasive," respectively, despite the fact that neither had the benefit of Dr. Shah's assessment following Plaintiff's lumbar surgery.  At the initial consideration stage, without the benefit of any evidence from Dr. Shah, Dr. Czwalina reviewed the records and rendered his opinion on December 7, 2020, 10 days after Dr. Shah diagnosed Plaintiff with a "[t]raumatic rupture of the lumbar intervertebral disc," and prior to Plaintiff's lumbar surgery.  See tr. at 77 (initial consideration decision); 60-62 (list of medical records reviewed at initial determination does not include Dr. Shah's), 797 (Dr.

---

[25]Later in his brief, Defendant argues that Plaintiff's need for a cane "is largely irrelevant because the use of a cane does not significantly impact the ability to perform sedentary work."  Doc 12 at 7-8.  This proves Plaintiff's point that Dr. Shah's limitation regarding Plaintiff's ability to sit for prolonged periods is critical to the ALJ's determination that Plaintiff can perform sedentary work.

Shah's diagnosis on 11/27/20).[26]  Although the ALJ acknowledged that Plaintiff's recent

lumbar spine surgery require greater exertional limitations than noted by Dr. Czwalina,

she found the doctor's opinion "generally persuasive."  Id. at 24.   On reconsideration,

Dr. Hubbard rendered his opinion on February 12, 2021, prior to Dr. Shah completing his

Medical Source Statement.  Id. at 92.  Although Dr. Hubbard received records from Dr.

Shah and acknowledged that the doctor planned lumbar decompression surgery, id. at 87,

91, he failed to reference Dr. Shah's diagnosis, acknowledge the MRI from October 17,

2020, indicating disc bulges at L4-5 and L5-S1, and failed to consider the lumbar related

evidence (other than noting "[p]ositive lumbar spasm") in assessing Plaintiff's postural

limitations.  Id. at 89.  The ALJ found Dr. Hubbard's opinion persuasive.  Id. at 25.

In short, the ALJ found Dr. Shah's assessment only partially persuasive, in part

based on a misinterpretation of the treatment notes following Plaintiff's lumbar surgery.

Thus, the ALJ rejected Dr. Shah's opinion for the wrong reason.  Rutherford, 399 F.3d at

554.  At the same time, the ALJ found the opinions of the record reviewers "generally

persuasive" and "persuasive" despite the fact that neither had the benefit of the surgical

notes nor mentioned the MRI evidencing the two lumbar disc bulges.  Therefore, I will

remand the case for further consideration of Plaintiff's lumbar impairment.

---

[26]The lumbar MRI establishing the disc bulges at L4-5 and L5-S1 was performed on October 17, 2020, but was contained in the records provided by Dr. Shah, tr. at 799, 863, and 1049, which were not provided to Dr. Czwalina.  Id. at 60-62 (records reviewed for initial determination).  Thus, it does not appear that Dr. Czwalina had any objective evidence regarding Plaintiff's lumbar impairment.

Plaintiff also complains that the ALJ failed to properly consider Dr. Shah's

opinion that she required the use of a cane for walking post-lumbar surgery.  Doc. 11 at

12.  Defendant responds that "this point is largely irrelevant because the use of a cane

does not significantly impact the ability to perform sedentary work."  Doc. 12 at 7-8.

Because I have already determined that the case must be remanded for further

consideration of Plaintiff's lumbar impairment, Defendant should also reevaluate

Plaintiff's need for a cane and recontact her treatment providers if necessary to obtain

clarification in this regard.

Finally, Plaintiff contends that the ALJ failed to properly consider her subjective

complaints, including failing to take into account her demonstrated work history.  Doc.

11 at 14-16.[27]  Defendant faults Plaintiff for relying "sole[ly]" on the ALJ's failure "to

explicitly consider" her work history, Doc. 12 at 11, and maintains that the ALJ properly

considered Plaintiff's subjective complaints.  Id. at 9-12.  Because I have already

determined that the case must be remanded, I discuss this claim only briefly.

If Plaintiff's challenge were limited to the ALJ's failure to consider her work

history in assessing her subjective complaints, I would be inclined to reject the argument.

"Work history 'is only one of many factors an ALJ may consider in assessing a

claimant's subjective complaints.'"  Sanborn v. Colvin, Civ. No. 13-224, 2014 WL

3900878, at *16 (E.D. Pa. Aug. 11, 2014) (quoting Thompson v. Astrue, Civ. No. 09-

---

[27]Although Plaintiff presented this as a claim challenging the ALJ's assessment of
her credibility, she acknowledges that the Administration has eliminated the term
"credibility" from the regulations applicable to the assessment of a claimant's subjective
complaints.  Doc. 11 at 14 n.20.

519, 2010 WL 3661530, at *4 (W.D. Pa. Sept. 20, 2010) (citing 20 C.F.R.

§ 404.1529(c)(3))), aff'd 613 F. App'x 171 (3d Cir. 2015)  "Indeed a claimant's work

history alone is not dispositive of the question of . . . credibility, and an ALJ is not

required to equate a long work history with enhanced credibility."  Id. (quoting

Thompson, 2010 WL 3661530, at *4).  In affirming the district court in Sanborn, the

Third Circuit concluded that the ALJ's failure to consider the claimant's substantial work

history did not require remand because the ALJ explained her reasoning and Plaintiff's

testimony of more restrictive abilities was belied by the medical evidence and evidence

of a more active lifestyle.  613 F. App'x at 177.

      Here, however, Plaintiff also contends that the ALJ's assessment of Plaintiff's

complaints was tainted by her misinterpretation of the post-surgical treatment note.  Doc.

11 at 14-15.  The ALJ rejected Plaintiff's subjective complaints:  "As for [Plaintiff's]

statements about the intensity, persistence, and limiting effects of his or her symptoms,

they are inconsistent because the evidence in the record does not support the severity of

the symptoms alleged."  Tr. at 20.  The problem is that in citing the record evidence with

which Plaintiff's complaints were allegedly inconsistent, the ALJ twice relied on the

same misinterpretation of the post-lumbar surgery treatment note.  Id. at 22 ("she was

told after tapering narcotics she could return to driving as she had normal strength and

good range of motion"), 23 ("While she required surgical intervention for her lumbar

spine disorder, at her post-surgical follow-up, [Plaintiff] was noted as having good range

of motion and normal strength.").  As previously discussed, this was a misinterpretation

of the record because the note referenced establishes that Plaintiff had decreased lumbar

range of motion and was unable to toe and heel walk on the right.  Id. at 848.  On remand,

Defendant shall reconsider Plaintiff's subjective complaints after having reconsidered

Plaintiff's lumbar impairment and, if determined to be relevant, should consider

Plaintiff's work history in considering Plaintiff's subjective complaints.

**IV.**     **CONCLUSION**

The ALJ's consideration of the opinion of treating neurosurgeon Dr. Shah was

flawed because the ALJ misinterpreted post-surgical treatment notes.  This

misinterpretation was not harmless, and it also tainted the ALJ's consideration of the

opinions offered by the state agency record reviewing physicians and the ALJ's

consideration of Plaintiff's subjective complaints.  Thus, the ALJ's decision is not

supported by substantial evidence.

An appropriate Order follows.